IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

MARK MILLIGAN                                                                            PLAINTIFF

v.                                     No. 4:06CV00368 JMM

SOCIAL SECURITY ADMINISTRATION                                       DEFENDANT

**<u>ORDER</u>**

Plaintiff has appealed the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The parties have submitted their appeal briefs,[1] and the issues are now joined and ready for decision.

The Court's function on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.[2]

> Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion. In determining whether existing evidence is substantial, we consider evidence that detracts from the Commissioner's decision as well as evidence that supports it. As long as substantial evidence in the record supports the Commissioner's decision, we may not reverse it because substantial evidence exists in the record that would have

---

[1] Plaintiff's brief was filed on July 14, 2006, and the Commissioner's brief was filed on August 10, 2006.

[2] Plaintiff had the burden of proving his disability by establishing a physical or mental impairment lasting at least one year that prevents her from engaging in any substantial gainful activity. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); <u>Baker v. Apfel</u>, 159 F.3d 1140, 1143 (8th Cir. 1998); <u>Ingram v. Chater</u>, 107 F.3d 598, 601 (8th Cir. 1997).

>supported a contrary outcome, or because we would have decided the case differently.

Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000) (citations omitted).

Plaintiff filed an application for DIB (Tr. 51-53) and SSI (Tr. 223-226) on April 14, 2003, alleging that he became disabled on December 31, 2000, due to seizures (Tr. 73).[3] He met the special earnings requirements for DIB through December 31, 2005 (Tr. 69). His claims were denied initially and upon reconsideration (Tr. 35-39, 229-230). Pursuant to plaintiff's request, a hearing was conducted by the Administrative Law Judge (ALJ) on June 15, 2004 (Tr. 435-473), on his claims of seizures, depression and fatigue (Tr. 18). Also present and testifying were Debra Milligan, his wife, and William Elmore, MRC, a vocational expert (VE).

Plaintiff was 38 years old on the date of hearing (Tr. 438). He has a GED and can read and write reasonably well (Tr. 438). Plaintiff has past relevant work (PRW) experience in the Army in the infantry for nine years and as a carpenter, assembly line worker building air coolers, and paint and body worker for recreational vehicles (Tr. 18, 439-440).

At the hearing, plaintiff testified that he stopped work in December of 2000 when he started having seizures on the job (Tr. 441). He stated that the physician ran some tests and he was put on Dilantin which he has been on ever since (Tr. 442). Plaintiff continued that although he sometimes feels a seizure coming on by feeling weak, he usually has no warning, has bitten his tongue, and hurt his back and arms when he has fallen (Tr. 443). He testified that the mini seizures he has are just shaking and trouble breathing, but leave him real exhausted while the grand mal seizures – about 5 to 7 over a span of a year – are violent and take him a day or two to get his energy back (Tr. 444,

---

[3]Plaintiff had previously filed a claim for DIB which was denied on April 2, 1996 (Tr. 69).

458).  As to restrictions placed on him by physicians, plaintiff stated that the doctor did not want him to work, drive or exhaust himself in any ways (Tr. 445).  Around the home, he related that, with his wife working and his getting hungry, he will cook, but if he goes outside to mow more than a few rows, he will get weak and white as a sheet (Tr. 445).  Plaintiff also stated that he started getting migraine headaches about the same time as he started having seizures, that they occur about every other day, that they can last anywhere from 10 minutes to a couple of hours to a whole day, the pain is between a 5 and a 10, and he has ringing in his ears all the time (Tr. 446-447).  He takes Aleve for the headaches (Tr. 446).

Plaintiff added that he had been on Albuterol for a couple of months for "[e]very now and then" asthma attacks which limits his walking and is irritated by pollen, dust, fumes, heat and humidity (Tr. 447-448).  He testified that he has an AC separation in his shoulder from an accident in 1998 which restricts his lifting above shoulder level and he could pick up and carry 20 pounds for a short distance and probably 5 pounds frequently with pain every now and then (Tr. 448-449).

Plaintiff said he was not being treated for depression although he had been in the past from the experiences he had on active duty (Tr. 449-450).  When asked about his emotional symptoms and how he gets along with his family and friends, plaintiff stated that he wants to be by himself a lot of times when little things get on his nerves and he blows his top before going to his room and shutting everyone out (Tr. 451).  He said every now and then he had flashbacks to where he served and, while he had taken some kind of medicine once before, it had not helped and he had not tried counseling in the last three or four years (Tr. 451-452).

He described his time as sitting and being bored, watching TV, petting his dogs, going with his wife to the VFW every now and then shooting a couple of games of pool, and going out to eat

every now and then (Tr. 454-455).  Plaintiff stated that his back had been hurting for a couple of weeks, he has to stop for being out of breath when he walks the 50 yards to the mailbox, and his wife takes care of most of the duties around the house (Tr. 455-456).

Upon questioning by the ALJ about the times that plaintiff has been non-compliant with taking the Dilantin, he stated that he runs out of the medication and has no money to get it and also admitted to drinking one or two beers every now and then (Tr. 457).  When the ALJ pressed him that the record showed that when plaintiff was not taking Dilantin and drinking beer plaintiff would get in trouble with seizures, plaintiff acknowledged that it can happen, but his wife has been stopping him and the only reason he drinks a couple of beers every now and then is because the doctor said it would help flush out the kidneys  (Tr. 457-458).  The ALJ also noted that he had not seen any medical documentation to support a definitive diagnosis of asthma (Tr. 459).

Plaintiff's wife testified that his frustration level was low and about half of the 5 or 6 times a year that he has seizures are violent with his arms and legs flinging around (Tr. 460-462).  She further testified that he has the most trouble when he is not taking his Dilantin and she has to make sure he takes it on a daily basis (Tr. 462-463).  Plaintiff's wife continued that she has to remind him of all his medications and drives him everywhere (Tr. 463-464).

The ALJ undertook the familiar five-step analysis in determining whether plaintiff was disabled.[4]  He found  that plaintiff had not engaged in substantial gainful activity since the alleged

---

[4]The five-step sequential evaluation is as follows: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether he or she has a severe and medically determinable physical or mental impairment; (3) whether the claimant may be deemed disabled because  the impairment meets or equals a listed impairment in Appendix 1 to Subpart P, Title 20, Code of Federal Regulations; (4) whether the claimant is able to return to past relevant work, despite the impairment; and if not (5) whether the claimant can perform any other kind of work. 20 C.F.R. §§  416.920 and 404.1520.  See, Cox v. Barnhart, 345 F. 3d 606, 608 n. 1 (8th Cir.

onset of disability (Tr. 18). The ALJ further found that plaintiff has a history of treatment for a seizure disorder, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 18). He also noted that while plaintiff had initially reported depression, plaintiff stated at the hearing that he no longer suffered from depression and so the ALJ found that plaintiff did not have a severe mental impairment (Tr. 20).

The ALJ evaluated plaintiff's subjective allegations and complaints pursuant to the criteria set forth in <u>Polaski v. Heckler</u>, 739 F. 2d 1320 (8th Cir. 1984).[5] He found that while plaintiff had some level of discomfort, the subjective allegations were not borne out by the overall record and were not fully credible (Tr. 21-23). The ALJ also found, based on the testimony of the VE, that plaintiff could not perform any of his PRW (Tr. 22, 468), but that plaintiff had the residual functional capacity (RFC) for work with routine seizure precautions (Tr. 20, 22). The ALJ asked the VE whether jobs exist for an individual of the plaintiff's age, education with no documented physical restrictions but observing routine seizure precautions such as avoiding unprotected heights, dangerous machinery, operation of automotive equipment (Tr. 468). The VE testified that given the GED and skilled work history of the hypothetical individual, he could consider skilled and semi-skilled jobs such as general office clerk[6] that is light and semi-skilled work and which occurs at a

---

2003).

[5]These include the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) other treatments for relief of pain; and (6) functional restrictions.

[6]Dictionary of Occupational Titles, Section 209.562-101, Clerk General (clerical) alternative titles, office clerk, routine. Performs any combination of following and similar

frequency of just under 6,000 in this state, in the nearby region of around 77,000, and are nationally of 2.7 million (Tr. 469). When asked by the ALJ to assume the same hypothetical age, GED, no documented physical restrictions with seizure disorder, given to unexpected periods of unconsciousness which may publish harm to himself or others, the VE answered that it would be the same (Tr. 469). Therefore, the ALJ found plaintiff not to be disabled (Tr. 23-24).

Plaintiff requested review of the ALJ's decision (Tr.13). The Appeals Council initially denied his request for review on September 13, 2004, but, after considering additional evidence, vacated that order and then denied review on February 23, 2005 (Tr. 5-12). On March 24, 2006, plaintiff filed this action pursuant to 42 U.S.C. §405(g).[7]

Plaintiff contends that the ALJ erred in only mentioning the presence of seizures while ignoring the testimony that plaintiff was exhausted and tired after the seizures and would sometimes injure himself or others thereby disrupting any normal work processes. He also faults the ALJ in not mentioning other medically determinable disabilities such as a minor impairment to his right knee; an AC shoulder separation of the right shoulder that would prevent overheard lifting; asthma

---

clerical duties requiring limited knowledge of systems of procedures: Writes, types or enters information into computer, using keyboard, to prepare correspondence, bills, statement, receipts, checks, or other documents copying information from one record to another. Proofreads records or forms. Counts, weighs, or measures material. Sorts and files records. Receives money from customers and deposits in bank. Addresses envelopes or packages by hand or with typewriter or addressograph machine. Stuffs envelopes by hand or with envelope stuffing machine. Answers telephone, conveys messages, and runs errands. Stamps, sorts, and distributes mail. Stamps or numbers forms by hand or machine. Photocopies documents, using photocopier.

[7]Plaintiff requested permission from the Appeals Council to file a belated appeal to this Court in light of his September 9, 2005 affidavit stating that he had not received the September 2004 decision due to his incarceration in the Pulaski County Detention Facility from August 1, 2004 through January 2005 when he was transferred to the Arkansas Department of Corrections until his release on July 14, 2005, and so did not learn of the decision until visiting his attorney's office in September of 2005 (Tr. 239-241).

requiring a clean type of environment; and his mental impairments which have been diagnosed, variously, as intermittent explosive disorder and personality disorder, depression with possible psychotic features, and personality and anxiety disorders which required a full psychiatric analysis. In addition, plaintiff asserts that further credibility analysis is necessary as his testimony was sufficient and forthright as was his spouse's, that – while not fully compliant – he took medication that was not effective and he had sought out the services of vocational rehabilitation. Plaintiff also points to the VE, once plaintiff's counsel had posed a hypothetical question encompassing all of plaintiff's impairments, stating that no such work could be identified.

The ALJ's written opinion reflected a review of the medical records. Plaintiff has a history of being hospitalized several times for seizure activities (Tr. 19). Most of his medical records consist of emergency room visits.

Plaintiff was admitted to the Baptist Memorial Medical Center emergency room on November 21, 1999, where he was initially seen by Dr. Jeffery Kirchner. The notes of Dr. James Rice, who took over the case, reflect that it was not known if plaintiff had a seizure but it was known that he had been drinking alcohol fairly heavily; the head CT was negative (Tr. 105). The diagnosis was alcohol intoxication and he was released with the plan to not drink alcohol and follow up with a doctor of choice as needed (Tr. 105).

On January 16, 2000, plaintiff was seen at the Rebsamen Medical Center emergency room by Dr. Ron Fewell before being admitted with a diagnosis of drug overdose/suicide gesture (Tr. 296-333). The notes of Valerie Dewese, MSW, state:

> Visited with patient who reports getting into an arguement [sic] with his girlfriend and passing out. He reports only drinking two pitchers of beer and taking three pills for his chest pain. Patient does not recall what medication it was; it was not meds [sic] prescribed for his chest pain. Patient states that he is not suicidal and has not

had thoughts of harming himself. He states he has passed out before when he gets over excited; he state he has anxiety attacks. Informed patient that he runs the risk of being involuntarily committed if he has frequent admissions to the hospital for alcohol and taking medications that appears to be a suicidal attempt. Patient safe to be discharged at this time. No other needs.

An x-ray of plaintiff's right knee for August 3, 2000, was normal (Tr. 172).

On August 4, 2000, plaintiff was brought to the Baptist Memorial Medical Center emergency room by his wife with the chief complaint of "passed out" (Tr. 102). The history taken by Dr. Kirchner follows:

> This is a 33-year-old male brought in because of above. According to his wife, they were in an argument about who was driving their van home. She works at a bar and he was there to pick her up and evidently had a beer plus a pitcher. She was upset and wanted herself to drive as he had drank so much alcohol. Evidently he started driving and appeared to be somewhat short of breath and had a possible syncopal episode. She was able to pull the van off to the side. He woke up enough to help get himself out of the van and collapsed on the ground. She was able to get him back up again. As no jerking sensation, no loss of bowel or bladder control. They got him here and he was placed in a wheelchair and wheeled back to the room. He was somewhat unresponsive with this. However, once he got to the room he started to become somewhat belligerent, and flailing around after ammonia capsule was used and sternal rub. Because of his condition I was unable to get any history from him. All this is obtained from his wife. He had seen Dr. Daugherty with questionable seizures, but not on any medications at present. He has been off his medications for 8 months. His last event of this was about three months ago. She states it seems like it happens less frequently and cannot assess whether it is associated with alcohol or not. He had a history of some recreational drug usage many years ago, but not at present.

(Tr. 102). His blood alcohol was 0.188 (Tr. 103). The assessment was syncopal episode that may be related to alcohol intoxication, to avoid alcohol, and to follow up with Dr. Daugherty (Tr. 103).

Dr. Richard Doncer, at the emergency room at St. Vincent's Medical Center, examined plaintiff on December 30, 2000, after plaintiff had passed out at his nephew's funeral with a generalized type seizure and had forgotten to take his Dilantin that morning (Tr. 144). Plaintiff advised that he smokes two packs per day with very occasional ETOH use (Tr. 144). His diagnosis

...

was seizures and it was felt that plaintiff was not compliant; he was to be "loaded" with Dilantin, follow-up with his primary care physician, and advised not to drive (Tr. 145).

Plaintiff was seen at the emergency room at Baptist Memorial Medical Center on February 6, 2001, complaining of low back pain (Tr. 99). It was noted that he smokes and uses ethanol (Tr. 99). Dr. Robert Harrell found tenderness in the lower back, but no acute abnormalities were seen in the x-rays (Tr. 100). He was given Flexeril and Tylenol 3 with bed rest for 24 hours (Tr. 100).

On July 5, 2001, plaintiff was seen by Dr. Larry Price at the Rebsamen Medical Center after passing out on the floor where he had a low level of Dilantin and was informed about drinking and seizures (Tr. 165-171).

Plaintiff was brought to Baptist Memorial Medical Center emergency room by ambulance from his home on November 26, 2001, after he had a tonic-clonic seizure that was persistent after he had been drinking some that day and had not taken his Dilantin (Tr. 96-97). Under habits are listed that he smokes and uses alcohol (Tr. 97). Dr. Harrell's assessment was seizure disorder and ethanol abuse (level was 0.188); the plan was that plaintiff was to take his medications, no ethanol, follow-up with his doctor, return if increasing symptoms, and has wife agreed when discussed (Tr. 98).

On January 5, 2002, plaintiff was brought to the emergency room at St. Vincent's Medical Center from a patient's room where he was visiting when his sister and girlfriend believed that plaintiff may have had a seizure believed to be related to alcohol which he had been drinking heavily recently; his girlfriend stated that she had seen that he takes his Dilantin regularly, but only noted he had been drinking heavily (Tr. 123). He was admitted by Dr. Thomas Minnich (Tr. 124).

His family brought plaintiff to Dr. Doncer at the emergency room at St. Vincent's Medical Center on January 28, 2002, when he was found, unresponsive, in his truck with the engine running (Tr. 109). He was noted as having a history of seizures and noncompliance as well as a history of drinking fairly heavily at times; his ETOH level was 0.180 (Tr. 109). When plaintiff suddenly became very combative and agitated, the Sherwood Police Department was required to keep him under control and in four-point restraint while he was sedated (Tr. 110). After consultation with Dr. Robert Stanley, he was admitted to ICU being diagnosed with alcohol intoxication, seizures, acute psychosis, and possible overdose (Tr. 111). Dr. Stanley's notes from January 29, 2002, reflect that plaintiff reported drinking a six pack, he has a history of seizure disorder, and he is somewhat combative when he awakes from intoxication (Tr. 112-113). Plaintiff was released and advised to strongly stop alcohol consumption and to stop smoking (Tr. 113).

Plaintiff arrived by ambulance on December 26, 2002 for possible seizure – although no activity seen by paramedics – and intoxication (blood alcohol 177) for which he was restrained with handcuffs by the police; he was directed by Dr. Kimberly Garner to take Dilantin as directed and not to drink alcohol because it made him seize (Tr. 158-164).

On March 21, 2003, plaintiff was brought to the Rebsamen Medical Center emergency room by the police after an altercation with his girlfriend for acute intoxication (blood alcohol 182) and with two superficial scratches on his wrist (Tr. 390-391). The report by Dr. Paul Veach reflects that after plaintiff was told that he was not being admitted and the police were taking him to jail, plaintiff feigned a seizure and then said he took a handful of Dilantin (Tr. 390).

The record shows plaintiff was brought in handcuffs to the emergency room at Rebsamen Medical Center by the police on March 21, 2003, needing Dilantin (Tr. 155).

Plaintiff arrived by ambulance to the Rebsamen Medical Center on April 6, 2003, for seizure disorder and medical noncompliance as his Dilantin level was zero (Tr. 151).

Lab reports for April 29, 2003 and May 6, 2003 showed that plaintiff's Dilantin level was low or sub-therapeutic (Tr. 199, 201).

On May 5, 2003, Dr. John Daugherty wrote at "To whom it may concern" note as follows:

> Mark Milligan 10/22/1966 has a Seizure Disorder and in the past has not been compliant with taking his medications. Due to this medical condition it is not recommended that Mark drive or work until his Dilantin level falls under the normal range. This is not only for Mark's safety, but for the safety of others as well. Please contact me with any further questions you may have.

Plaintiff was seen by Dr. Charles Schultz at Rebsamen Medical Center on May 9, 2003, for an EEG which was a normal awake EEG with no evidence of epileptiform discharges or lateralizing features seen (Tr. 148).

A Mental Health Assessment was performed by the Arkansas Rehabilitation Services on June 18, 2003, by Dr. Bill Owens by a referral from plaintiff's lawyer (Tr. 175). Dr. Owens diagnosed plaintiff as having a depressive disorder not otherwise specified with possible psychotic features and would have vocational limitations of difficulty with attention/concentrating; low frustration tolerance; low self-confidence; low energy level; lack of initiative/motivation; difficulty relating to others; avoid working with large numbers of people; difficulty making decisions; avoid high-stress situations; and difficulty adapting to change (Tr. 174). His further conditions were seizure disorder, AC separation of right shoulder, and thrombocytopenia, by history, with cause unknown (Tr. 175). Dr. Owens stated that plaintiff should avoid work overhead, lifting, pushing, pulling, avoid strenuous repetitive use of the right arm, avoid heights, avoid dangerous machinery, and should not drive on a job (Tr. 175).

Dr. Brad Williams completed a consultative psychiatric review technique on September 19, 2003 (Tr. 203-219). He found anxiety-related disorders, personality disorders, and substance addiction disorders (Tr. 203). In the functional capacity assessment, Dr. Williams stated "[t]he claimant is able to perform work where interpersonal contact is routine but superficial, e.g. grocery checker; complexity of tasks is learned by experience, several variables, uses judgement within limits supervision required is little for routine but detailed for non-routine" (Tr. 219).

Dr. Nancy Toombs saw plaintiff on September 8, 2003, for a consultative mental status examination (Tr. 178). He stated to her that he had a seizure disorder that was diagnosed in 1996, that the medicine controls them, but he could not tell her when he had his last seizure (Tr. 178). She reports that he made a number of remarks about his role in the Army noting that he "... was gamy; he would give these kind of remarks throughout today's interview..." (Tr. 179). Dr. Toombs observed that plaintiff never presented mental health problems during the interview and when she specifically asked him, he would respond that other people thought he did, maybe he did and maybe he did not, and then stated that he did not need treatment (Tr. 179). When she asked him about alcohol, plaintiff stated that he drank four beers a week; when asked if he had an alcohol problem, he responded that he would rather not answer that (Tr. 180). She described his attitude and behavior as making no eye contact, staring straight ahead or laying his head on the desk as if trying to sleep, and many times not answering questions (Tr. 180). Dr Toombs further reported that plaintiff was observed turning to any empty chair and making whispering noises which, when ignored, resulting in him rasing his voice to saying "no" or "be quiet" until her failure to acknowledge the behavior caused it to stop (Tr. 180). He stated that he had difficulty in falling asleep and early morning awakening and ate only one meal a day (Tr. 181). Her diagnostic impression was intermittent

explosive disorder, malingering, polysubstance abuse in remission; antisocial personality disorder; and seizure disorder with his mental health prognosis as fair (Tr. 181). She noted that he had no difficulty with speech or language and could communicate his needs (Tr. 182). When plaintiff reported that he watched tv and sleeps all the time and the doctor reminded him of his previous statements of sleeping problems, he responded that he sleeps when he does not have those problems (Tr. 182). He also reported that he plays pool because he likes "to hit those balls real hard" and he enjoys "drinking my beer when I play my pool" (Tr. 182). Dr. Toombs continued that plaintiff can see to his own hygiene and self care and on occasion might help with the cooking, grocery shopping ro laundry if he felt like it; she believed that he is more than capable of seeing to all activities of daily living (Tr. 182). She also did not observe any difficulties with physical development, concentration, persistence and pace (Tr. 182). Under the heading of "Cognition," Dr. Toombs wrote:

> The claimant has no limitations in adaptive functioning. I believe the claimant is malingering to appear mentally ill.
>
> I asked the claimant if there was anything else he wished for me to tell social security and he states "I'm sure that you have my records that show that I'm homicidal and suicidal". I asked him if he were homicidal and suicidal and he states "death ain't nothing to me". I asked him again if he was suicidal or homicidal and he stated "if they piss me off". I asked him a third time if he were homicidal or suicidal and he stated "I guess". I asked him to elaborate on that, I asked him if he plans to hurt anybody else or to hurt himself and he stated "I don't know, I might". I asked him specifically if he had any plans to hurt another person and he stated "if they leave me alone I won't do anything". The claimant never would specifically answer this question; again this is the type of gamy responses that I would receive. I asked him about his anger problems and he states "if they piss me off there's going to be a problem". "I've already been in jail two times over this". He states that he was jailed in 2003 and 2002 for domestic violence and "I had to go to those stupid domestic violence classes and that was a real joke". He states that he was arrested for choking his girlfriend but states "now she's my wife". He then was arrested for attempting to throw a knife at her and states "yeah I had to pay a fine, that whole stuff was a joke". He states that as long as his family "leaves him alone" that

>everything is fine, but if they "piss him off" then he is going to do something erratic. I asked him why it would not be better for him to just live alone that way he would not have to be concerned about people "pissing him off" and he states "why live alone, I want somebody there when I want them there". But sometimes I want to be left alone and they need to learn when to leave me alone and then there won't be a problem". The claimant is a typical antisocial; he has no interest in treatment, he enjoys intimidating people, he is aware of his behavior and how he can intimidate and bully others. Today there was intent on his part to whisper to the chair next to him hoping that I would point out this behavior or hoping that I would comment on this behavior as if he were hearing voices. The claimant is not psychotic, he is not delusional, he is quite coherent, he is cogent and he is well aware of his behavior. If he hurts anybody then it is certainly by choice. He uses this homicidal and suicidal ideation to try and communicate that he has a mental problem when in reality he has a behavior problem and he has a personality disorder but he is certainly not psychotic. The claimant intentionally would not provide information and than at the end of the interview wanted to let me know that he was homicidal and suicidal. This is very typical of individuals who are malingering. He is competent to manage his own benefits, but he may not use them in his own best interest.

(Tr. 182-183).

The ALJ reviewed Dr. Toombs report as well as noting that the plaintiff reported at the hearing that he no longer suffers from depression. He added that the evidence fails to show that plaintiff's daily activities are restricted due to emotional causes or that there is significant deficit in this ability to function socially. Thus, the ALJ concluded that plaintiff did not have a severe mental impairment (Tr. 20).

He also noted that the medical findings are not consistent with the symptoms alleged by plaintiff or that any physician had found that he was unable to work whereas the testimony and plaintiff's activities sheet reflected that he could take care of his personal needs, do laundry, wash dishes, change sheets, iron, vacuum, take out the trash, do home repairs, repair appliances, repair cars, wash the car, rake leaves, shop for clothes, go to the post office, prepare meals, occasionally drive, attend church, watch television, listen to the radio, and visit friends although he has provided inconsistent information regarding daily activities (Tr. 21).

The ALJ pointed out that plaintiff did not seek regular medical care with him seeking treatment through emergency room admissions which medical evidence also shows that he has not been compliant with his medications and he has repeatedly been warned to take his Dilantin and quit drinking alcohol (Tr. 22). He also considered the testimony of plaintiff's wife but found, in light of the previously discussed factors and her uncritical acceptance of plaintiff's complaints and some degree of desire to see him obtain benefits, it was not persuasive (Tr. 22).

Th ALJ acknowledged that Dr. Daugherty indicated on May 5, 2003 that plaintiff was unable to work or drive **until** [emphasis in original] his Dilantin level feel within the normal range, but noted that the doctor reported that plaintiff had not been compliant with his medications (Tr. 22). He explained that the doctor's opinion did not mean that plaintiff was totally disabled and could not perform substantial gainful activity, but that he was a danger to himself and others when he was not compliant with the medication (Tr. 22).

The Commissioner argues that the ALJ properly determined that plaintiff's mental impairments are non-severe as supported by Dr. Toombs' examination and report concluding that he was a malingerer, plaintiff's own hearing testimony about no longer suffering from depression, and his wide variety of daily activities. The Commissioner is correct in asserting that the ALJ is entitled to rely on a psychologist's opinion that a claimant is malingering. See, Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004).

The Court is persuaded that the following excerpt from Nielson v. Barnhart, 88 Fed.Appx. 145, 147, 2004 WL 120520, *2 (8th Cir. 2004),[8] explains why the ALJ did not err:

---

[8] Eighth Circuit Court of Appeals Local Rule 28A(i).

>Nielson argues the ALJ erred by not completing a psychiatric review technique form (PRTF) or developing the record concerning his severe depression. These arguments also fail. Nielson did not mention depression as a basis for his continued disability until the hearing, nor did he seek treatment for depression. We also find no discernable notation of depression in Dr. Patel's records, and we note that Nielson was sent for evaluation to a consulting psychiatrist, whose findings would not support a severe mental impairment. Further, the ALJ discussed Nielson's testimony about depression, and concluded the depression was not severe. See 20 C.F.R. §§ 404.1521(a), 416.921(a) (2003) (nonsevere mental impairment does not significantly limit mental ability to do basic work activities); Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001) (ALJ may issue decision without obtaining added medical evidence if existing evidence provides sufficient basis for decision); Montgomery v. Shalala, 30 F.3d 98, 100-01 (8th Cir. 1994) (discussing failure to complete PRTF and harmless error).

The Commissioner next points out that plaintiff is not disabled because the record contains numerous examples that his seizures are alcohol induced and are a result of not taking the medication as prescribed although plaintiff was repeatedly advised by doctors to stop drinking and to properly take his medication. Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)( "An impairment which can be controlled by treatment or medication is not considered disabling."); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989)(failure to follow prescribed treatment for seizures without good reason will result in finding of not disabled). The Commissioner continues that the EEG administered by his treating doctor, Dr. Daugherty was normal, plaintiff has mainly sought treatment through emergency room admissions rather than seeking regular medical attention, and plaintiff feigned a seizure once in the emergency room to avoid going to jail.

The Court cannot find that the ALJ erred in not considering other impairments. As the Commissioner asserts, plaintiff did not indicate any difficulty with his shoulder when he applied for benefits and the medical evidence as to his shoulder as an impairment is scarce. Besides, plaintiff testified as to his residual ability to lift and carry objects with his right arm. He has not even argued that any restrictions to his shoulder would affect his RFC as a general office clerk. Similarly, the

medical records do not reflect any diagnosis of asthma suffered by plaintiff or any limits placed on plaintiff's activities due to asthma.

The Court finds that the ALJ properly evaluated both plaintiff's and his wife's credibility. He explained the conflicts with the medical record, plaintiff's own reports of daily activities, lack of medical attention, failure to follow physician's instructions, and Dr. Toombs' opinion of malingering. In the same vein, the hypothetical question suggested by plaintiff's counsel was not found by the ALJ to be supported by the record . Thus, the Court finds that the hypothetical question posed to the VE was proper and complete as containing the impairments as found by the ALJ.

In sum, the Court finds that there is substantial evidence to support the Commissioner's decision that plaintiff was not disabled.

Accordingly, the Commissioner's administrative decision is hereby AFFIRMED.

IT IS SO ORDERED this 9th day of July, 2007.

*James M. Moody*
UNITED STATES DISTRICT JUDGE